[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-11249

Non-Argument Calendar

_____

ENEDINA LISET RAMIREZ-LOPEZ,
KIMBERLY MAYDALY CHAVEZ-RAMIREZ,

Petitioners,

*versus*

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
Agency No. A220-306-839

_____

Before JORDAN, LUCK, and KIDD, Circuit Judges.

PER CURIAM:

Enedina Ramirez-Lopez, proceeding as the lead petitioner on behalf of herself and her minor child, petitions for review of the Board of Immigration Appeals's ("BIA") order affirming the denial of her application for asylum and withholding of removal. She argues that the BIA ignored binding precedent and erred in finding that there was no nexus between the harm she suffered and her membership in a particular social group. After careful review, we deny the petition.

## I. BACKGROUND

Ramirez-Lopez is a native and citizen of Guatemala who entered the United States in June 2021 with her daughter, Kimberly Chavez-Ramirez ("Kimberly"). The Department of Homeland Security issued notices to appear, charging both Ramirez-Lopez and Kimberly with being removable as aliens present in the United States without being admitted or paroled, pursuant to the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(a)(6)(A)(i). Through counsel, they both conceded removability.

Ramirez-Lopez then applied for asylum, withholding of removal, and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"), designating Kimberly as a derivative beneficiary of the requested relief. Ramirez-Lopez alleged that, after the

death of Arturo Rocael Chavez Funes ("Rocael"), her partner and Kimberly's father, his family used fraudulent and violent tactics to evict them from their home, and because she and Kimberly threatened Rocael's family's current ownership of the property, she and Kimberly would be in danger if they returned to Guatemala.

Ramirez-Lopez offered several documents in support of her application, including a written statement in which she elaborated on her experiences in Guatemala. Ramirez-Lopez explained that she, Rocael, and Kimberly were living together in Rocael's home when Rocael died in 2017. After Rocael's passing, Kimberly inherited the property, so they continued living there. Although there was documentation of Kimberly's inheritance of the home, Rocael's family fraudulently changed the deed to reflect that Rocael's mother, Catalina Funes ("Catalina"), owned the property. Catalina then instituted eviction proceedings, and Rocael's family used threats and violence to intimidate Ramirez-Lopez. Although Ramirez-Lopez reported their actions to the police and hired an attorney to fight for ownership of the property, she and Kimberly were eventually evicted, and the family faced no criminal consequences. When threats from Rocael's family continued following the eviction, Ramirez-Lopez and Kimberly came to the United States.

At a removal hearing before an immigration judge, Ramirez-Lopez's counsel clarified that she sought asylum and withholding of removal based on the following particular social groups: (1) family of Kimberly, (2) Guatemalan women, (3) women

who inherit property, (4) women lacking male protection, and (5) unmarried Guatemalan women. Ramirez-Lopez was questioned by her counsel, the government, and the immigration judge, and she elaborated upon the allegations made in her application and written statement.

During her testimony, Ramirez Lopez explained that, while she had no proof of Rocael's ownership of the property and he did not leave a will, Rocael orally stated before his death that the house belonged to his daughter. Ramirez-Lopez believed that Catalina, who was cordial with Kimberly prior to Rocael's death, was motivated to obtain the property for her family and objected to the arrangement Rocael desired because Kimberly was a girl and Ramirez-Lopez and Rocael never married. Soon after Rocael's death, his uncle came to the house and stole the documents that evidenced Kimberly's ownership of the property. During this incident, he assaulted Ramirez-Lopez, stole money, stated that the property belonged to his family, and warned Ramirez-Lopez that if she tried to interfere, the family would hurt her and Kimberly.

Once the ownership documents were altered, Catalina initiated eviction proceedings, alleging that Ramirez-Lopez should vacate the home and that Kimberly, as a girl, had no inheritance rights to the property. While these eviction proceedings were ongoing, issues continued between Rocael's family and Ramirez-Lopez. She recalled that, on one occasion, Rocael's aunt came to the property with a knife, chain, and lock, and called Kimberly a "problem" that she would "eliminate." Other members of Rocael's family soon

arrived at the property and called for Kimberly and Ramirez-Lopez to be burned inside the locked house. Although police rescued Ramirez-Lopez and Kimberly, Rocael's family did not face any criminal consequences and proceeded with their efforts to verbally threaten, attack, mock, and intimidate Ramirez-Lopez.

Ramirez-Lopez further testified that, after approximately three years of legal proceedings, a court granted Catalina ownership of the house, and she moved onto the property, telling everyone that it belonged to one of her surviving sons. Ramirez-Lopez began doing housework for friends and neighbors in exchange for alternative places to stay, but Rocael's family continued to harass her and threaten that Kimberly would "sooner or later . . . be eliminated" and never regain possession of the house. Because members of Rocael's family belonged to gangs, and the Guatemalan authorities were unable to provide protection, Ramirez-Lopez also believed she and Kimberly would be in danger if they returned to Guatemala.

Following the hearing, the immigration judge issued an oral decision denying relief. The immigration judge found that Ramirez-Lopez testified credibly but failed to show a nexus between the harm she suffered and an enumerated ground for relief under the INA. The immigration judge explained that, although he was sympathetic to Ramirez-Lopez's situation, her testimony revealed an inter-family dispute, and the family's reason for causing harm was about financial gain and property ownership rather than Ramirez-Lopez's membership in any particular social group. The

immigration judge therefore concluded that, because no nexus existed between the experienced harm and membership in a particular social group, Ramirez-Lopez failed to show past persecution. The immigration judge also found that Ramirez-Lopez had not demonstrated a well-founded fear of future persecution, since the property at issue was no longer hers, and no evidence indicated she would face any problems if she returned to Guatemala. As such, the immigration judge determined that Ramirez-Lopez failed to meet her burden of proving eligibility for asylum or withholding of removal. The immigration judge likewise concluded that Ramirez-Lopez presented insufficient evidence to demonstrate eligibility for CAT relief.

Ramirez-Lopez appealed the immigration judge's decision to the BIA and argued that she provided sufficient credible evidence to show she suffered past persecution because of her membership in the five particular social groups she proposed before the immigration judge. She also argued that the immigration judge overlooked Circuit precedent when rendering his decision, and she referenced *Perez-Sanchez v. United States Attorney General*, 935 F.3d 1148 (11th Cir. 2019) and *Sanchez-Castro v. United States Attorney General*, 998 F.3d 1281 (11th Cir. 2021).

The BIA dismissed Ramirez-Lopez's appeal. It first determined that Ramirez-Lopez failed to challenge the immigration judge's denial of CAT relief and considered the issue waived. The BIA next concluded that the immigration judge did not clearly err in finding that Ramirez-Lopez failed to establish a nexus between

any harm she experienced and a protected ground, because she testified that the harm was motivated by financial gain and a desire to obtain ownership of property. It explained that, although Ramirez-Lopez argued on appeal that she would not have been targeted but for her membership in a particular social group, a nexus "is not established simply because [she] identifie[d] a protected ground and experienced or fears harm." The BIA, however, made no reference to *Perez-Sanchez* or *Sanchez-Castro* when reaching this conclusion.

Ramirez-Lopez timely petitioned for review of the BIA's decision.

## II. STANDARD OF REVIEW

We review only the decision of the BIA, except to the extent that the BIA expressly adopts or explicitly agrees with the immigration judge's opinion. *Ayala v. U.S. Att'y Gen.*, 605 F.3d 941, 947–48 (11th Cir. 2010). Issues not reached by the BIA are not properly before us. *Gonzalez v. U.S. Att'y Gen.*, 820 F.3d 399, 403 (11th Cir. 2016).

We review the agency's legal conclusions *de novo* and review factual findings for substantial evidence. *Perez-Zenteno v. U.S. Att'y Gen.*, 913 F.3d 1301, 1306 (11th Cir. 2019). Under the substantial evidence standard, we view the evidence in the light most favorable to the agency's decision, draw all reasonable inferences in favor of that decision, and affirm the BIA's decision "if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* (quotation marks omitted). We will reverse the agency's fact findings only if the record compels it. *Id.*

## III. DISCUSSION

To be eligible for asylum, Ramirez-Lopez must, with specific and credible evidence, establish (1) past persecution on account of a statutorily protected ground, or (2) a well-founded fear that she will be persecuted in the future on account of a protected ground. *Diallo v. U.S. Att'y Gen.*, 596 F.3d 1329, 1332 (11th Cir. 2010). The statutorily recognized protected grounds include, among other things, membership in a particular social group. 8 U.S.C. § 1101(a)(42)(A).

Ramirez-Lopez must also meet the "nexus" requirement by demonstrating her "membership in a particular social group was or is at least one central reason for h[er] persecution." *Perez-Sanchez*, 935 F.3d at 1158 (quotation marks omitted); 8 U.S.C. § 1158(b)(1)(B)(i). The protected ground must be essential to her persecutor's motivation and "cannot be incidental, tangential, superficial, or subordinate to another reason for harm." *Sanchez-Castro*, 998 F.3d at 1286 (quotation marks omitted). For family-based particular social group claims, we "distinguish persecution of a family as a means to an unrelated end from persecution based on animus against a family *per se*." *Id.* at 1287. "Evidence that treatment is consistent with general criminal activity does not help [Ramirez-Lopez] with the nexus requirement." *Id.* at 1288.

As an initial matter, Ramirez-Lopez did not brief any challenge to the BIA's denial of her withholding-of-removal claim or determination that she waived any challenge to the immigration judge's finding that she was ineligible for CAT relief. As such, she

has abandoned any contention the BIA erred in these respects. *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1228 n.2 (11th Cir. 2005).

In the petition for review, Ramirez-Lopez argues that the BIA overlooked *Perez-Sanchez* and *Sanchez-Castro*, and BIA precedent examining these decisions, when dismissing her appeal. She further asserts that she demonstrated her eligibility for asylum because she connected her harm to grounds beyond a familial-based social group and demonstrated that animus was a central reason for her persecution, as Rocael's family's threats continued after her eviction from the property.

In *Perez-Sanchez*, we held that the BIA's finding that the petitioner had not established a nexus was not supported by substantial evidence. 935 F.3d at 1158. We explained that the evidence showed that a cartel specifically extorted the petitioner because of his father-in-law's experience with the cartel, where at one point, the cartel held the petitioner at gunpoint and told him that because his father-in-law owed him money, he did too. *Id*. We determined that "evidence compel[led] us to reject the BIA's conclusion that [the petitioner's] relationship to his father-in-law played only an 'incidental' role in the cartel's decision to persecute him." *Id*. To the contrary, "[i]t [wa]s abundantly clear to us that the family relationship was one central reason, if not the central reason, for the harm visited upon [the petitioner]." *Id*. at 1158–59.

On the other hand, in *Sanchez-Castro*, we held that the BIA's finding that the petitioner had not established a nexus was supported by substantial evidence where her family members were

targeted as victims of ordinary criminal activity and not because of their membership in the family. 998 F.3d at 1286–87. We held that to the extent a gang extorted the petitioner's mother, the record indicated that the extortion happened solely to raise funds and not to target the petitioner's family. *Id*. at 1287. We distinguished "persecution of a family as a means to an unrelated end from persecution based on animus against a family *per se*" and that "[w]here a gang targets a family only as a means to another end, the gang is not acting because of who the family is; the identity of the family is only incidentally relevant." *Id*. We determined that the petitioner's admission that the gang had a generic pecuniary motive against her distinguished her case from *Perez-Sanchez*. *Id*.

Here, substantial evidence supports the agency's finding that Ramirez-Lopez failed to establish a nexus between her proposed particular social groups and the harm she suffered. Although the BIA did not explicitly cite all applicable Circuit and BIA precedent, there is no indication that it neglected to consider controlling legal principles, because, taken as a whole, the record does not compel the conclusion that Ramirez-Lopez's familial relationship with Kimberly was a central reason for any of the harm she experienced. *See Sanchez-Castro*, 998 F.3d at 1286–87; *Perez-Zenteno*, 913 F.3d at 1306. Rather, substantial evidence supports the conclusion that the harm resulted from a private, familial dispute over property and that Rocael's family's behavior equated to general criminal acts. *Sanchez-Castro*, 998 F.3d at 1288.

Similar to the circumstances in *Sanchez-Castro*, Ramirez-Lopez admitted during her testimony that the attacks did not start until after Rocael's death and his family acted for financial gain, as they wanted only to prevent Kimberly from inheriting the property so that it could be used by other family members. *See id.* at 1287. Unlike *Perez-Sanchez*, Ramirez-Lopez did not demonstrate that any harm was on account of her protected status, as her familial relationship to Kimberly was incidental to the family's ultimate goal of obtaining the property. *See* 935 F.3d at 1158.

While some evidence suggests that Rocael's family targeted Ramirez-Lopez because she was Kimberly's mother and protector, the record does not compel a finding that Ramirez-Lopez's familial relationship to Kimberly was a central, rather than incidental or subordinate, reason for the harm she experienced. *See Perez-Zenteno*, 913 F.3d at 1306; *Adefemi v. Ashcroft*, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc) (stating the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the agency's findings).

Further, nothing in the record compels the conclusion that Rocael's family was motivated by animus against Kimberly's family distinct from the land ownership dispute. *See Perez-Zenteno*, 913 F.3d at 1306. While Ramirez-Lopez testified that threats continued after Rocael's family obtained the house, she described those threats as concerning the ownership of the property. This indicates that the central reason for the harm was the ownership

12              Opinion of the Court              24-11249

dispute rather than animus toward Ramirez-Lopez or Kimberly *per se*. *See Sanchez-Castro*, 998 F.3d at 1286–87.

### IV. CONCLUSION

For the reasons stated above, we **DENY** the petition for review.